THOMAS, Judge.
In 2006, Quentin Lamar Hale was employed by Hyundai Motor Manufacturing Alabama, LLC (“HMMA”), in the painting department. When Hale became employed by HMMA, he was provided an *1017 employee handbook, which outlined HMMA’s policies on various employment-related issues, including attendance and bereavement leave. Hale acknowledges receipt of the handbook.
The attendance policy reads, in pertinent part:
“Regular attendance is the cornerstone for the success of HMMA, a Team Member’s absenteeism can reduce the quality and effect of the overall efficiency of HMMA’s operations, as well as cause hardship on fellow Team Members who report to work regularly. Regular attendance is every Team Member’s responsibility, and every Team Member is expected to be on the job, on time, every scheduled workday.
“The minimum acceptable standard of attendance is 98%.
“Any scheduled workday missed is considered an absence. However, work time missed due to holidays, scheduled vacations, catastrophic event, jury duty, military duty, bereavement leave, short-term disability, work-related injury or illness, personal leave of absence and FMLA leave shall not be counted as an absence and are not cause for corrective action.
[[Image here]]
“When a Team Member’s attendance falls below 98% at any time during the first year or subsequent years of employment during any rolling twelvemonth period, corrective action will be considered....
[[Image here]]
“Accumulative absences that result in a Team Member’s attendance percentage falling below [the acceptable standard] may be cause for corrective action.
“The following will be considered:
“• Cause
“• Frequency
“• Patterns
“• Failure to report
“• Time pattern of reporting
[[Image here]]
“The corrective action process is intended to help Team Members correct any attendance problems. However, if the Team Member’s attendance continues to be unacceptable it could result in further corrective action up to and including termination.
“When a Team Member’s attendance percentage falls below the acceptable standard, corrective action may be considered. Corrective action is not automatic. Each Team Member’s attendance record will be reviewed based on its own merit, and the circumstances in each case are considered.
“However, when corrective action is taken, the following steps must be followed:
“1 Informal Discussion
“2 Formal Discussion
“3 Commitment Discussion
“4 Decision Leave
[[Image here]]
“When corrective action is required beyond the four steps above, the Team Member’s group leader and/or manager will contact the team relations manager and request a review of the Team Member’s record for termination. No termination will take place unless the action is reviewed and approved by the team relations manager, section manager, and director of Human Resources.”
The bereavement-leave policy in the HMMA handbook permits one day of bereavement leave to an employee if an employee’s aunt dies. Because of issues that arose regarding improper use of bereavement leave, HMMA circulated to its employees in March 2008 a document regarding the policy (“the bereavement-leave *1018 policy addendum”). In that document, HMMA states that “[a]ll Team Members are responsible for ensuring the relationship, as stated on their bereavement request, is accurate and true as it applies to the eligibility as stated above.... HMMA may request documentation to verify relationship of the deceased to the Team Member.” Furthermore, the bereavement-leave policy addendum warns that “[c]ompleting a request for bereavement for a person that is not eligible would be considered falsification. Falsification is considered a violation of the Serious Misconduct Policy and could result in corrective action up to and including termination.”
The serious-misconduct policy in the handbook reads, in pertinent part:
“HMMA requires a high degree of personal integrity from its Team Members. There are certain things a person can do that by nature are so serious that they place him/her outside of the ‘Corrective Action Policy.’ When a person commits one of those actions against HMMA and/or his/her fellow Team Members, he/she may be terminated from employment immediately.
[[Image here]]
“Listed below are some examples of activities that constitute serious misconduct at HMMA:
“•Serious and/or excessive violations of HMMA’s attendance program.
[[Image here]]
“• Intentionally misrepresenting or falsifying any information concerning employment or any report or HMMA record.”
Hale developed carpal tunnel syndrome, and he had surgery on his left arm in February 2008 and on his right arm in March 2008. Hale returned to work in April 2008, and he complained of continued symptoms in his right arm in June 2008. Hale underwent a second surgery on his right arm in September 2008. His physician, Dr. Stephen A. Samuelson, approved Hale’s return to light-duty work on October 6, 2008. Between October 6, 2008, and November 2, 2008, Hale missed nine days of work and took one day of bereavement leave. Hale then took short-term disability leave for the period between October 27, 2008, through February 16, 2009.
On February 20, 2009, HMMA’s medical-leave specialist, Jamie Spaulding, sent Hale a letter explaining that HMMA required him to provide documentation showing that his nine work absences in October 2008 were covered by an approved medical leave, to complete a bereavement-leave form for his absence on October 23, 2008, and to contact Spaulding within three days after receipt of the letter to arrange to return to work or to take action to seek further medical leave because Hale’s short-term disability leave had expired. Hale returned to work on February 24, 2009. On that same day, Hale met with manager Shane Brown, team-relations specialist Gabby Smith, and group leader Kyle Waites regarding his attendance.
According to Smith’s affidavit, Hale was informed at that meeting that he needed to provide documentation that the nine days he had missed in October 2008 were covered by an approved form of leave or that the days would count against him and lower his attendance percentage. Smith’s memorandum memorializing the February 24, 2009, meeting, which was attached as an exhibit to her affidavit, indicates that Brown informed Hale that Hale “had to bring documentation by Monday, March 2, 2009, that showed the relationship between him and his aunt” to verify his one day of bereavement leave. Hale testified in his deposition that at the February 24, 2009, *1019 meeting, he was informed that if he did not provide the necessary documentation for his absences, he would be discharged from his employment.
On March 5, 2009, Spaulding sent a second letter to Hale, again requesting documentation that the October absences were covered by an approved form of leave and requesting documentation to prove Hale’s familial relationship to support his bereavement leave. The letter stated that Hale had been informed at the February 24, 2009, meeting that all documentation was due to HMMA by March 2, 2009. Instead of providing the requested documentation, the letter recounted, Hale had taken a vacation day on March 2, 2009, and had called in sick on March 3 and March 4, 2009. The letter noted that Hale had no remaining personal days and that, unless appropriate documentation was provided, the March 3 and March 4 absences would be counted against Hale under the attendance policy. The letter demanded that Hale provide the requested documentation for his October absences, for his bereavement leave, and for the March absences by March 12, 2009. The letter further informed Hale that “HMMA’s Serious Misconduct Policy provides that a Team Member may be terminated for ‘serious and/or excessive violations of HMMA’s attendance program’ ” and that his failure to provide the requested documentation “may result in HMMA terminating your employment.”
On March 13, 2009, Sheron Rose, the Senior Manager of HMMA’s human-resources department, sent a final letter to Hale, in which she discharged Hale from his employment with HMMA. In the letter, Rose explained that Hale’s failure, after repeated requests, to provide documentation that the October absences were for HMMA-approved leave mandated that the absences be counted against Hale in determining his attendance percentage. Rose stated that she was discharging Hale from employment “pursuant to HMMA’s Attendance Policy, which requires the minimum acceptable standard for attendance of 98 percent, and pursuant to HMMA’s Serious Misconduct Policy, which provides that a Team Member may be terminated for ‘serious and/or excessive violation of HMMA’s attendance program.’ ” Rose further explained that Hale’s failure to provide proof of a familial relationship to support his bereavement leave was considered by HMMA “to be falsification, which is also a Serious Misconduct offense for which a Team Member is subject to termination of employment.”
After Hale was discharged from employment, he sought unemployment-compensation benefits. Although he was first denied benefits, Hale appealed the decision and sought an administrative hearing, at which HMMA did not appear. After the hearing, the administrative hearing officer awarded Hale unemployment-compensation benefits. In her September 2009 decision, the administrative hearing officer explained that, for purposes of the unemployment-compensation statute, “misconduct” had been defined as “a deliberate, willful, or wanton disregard of the employer’s interests or of standards of behavior which the employer has the right to expect of his employees.” The hearing officer concluded that “[t]he acts for which the claimant was discharged for [sic] was due to compelling reasons.” Thus, she determined that Hale’s violation of HMMA’s attendance policy was not “misconduct” in connection with his employment such that he should be disqualified from receiving unemployment-compensation benefits.
Hale sued HMMA in October 2009, seeking workers’ compensation benefits (“the workers’ compensation claim”) and alleging that HMMA had discharged him *1020 in retaliation for filing a workers’ compensation claim in violation of Ala.Code 1975, § 25-5-11.1 (“the retaliatory-discharge claim”). Hale and HMMA settled Hale’s workers’ compensation claim, and HMMA then moved for a summary judgment on Hale’s retaliatory-discharge claim. Hale opposed HMMA’s motion, arguing, among other things, that HMMA was collaterally estopped from arguing that it had discharged Hale for “misconduct” on the basis of the unemployment-compensation decision, which had determined that Hale had not committed misconduct in connection with his employment. The trial court entered a summary judgment in favor of HMMA on June 7, 2011, and Hale appealed to this court. This court transferred the appeal to the supreme court because we lacked jurisdiction, and the supreme court transferred the appeal back to this court pursuant to Ala.Code 1975, § 12-2-7(6).
We explained our review of a summary judgment in a retaliatory-discharge case in Hatch, v. NTW Inc., 35 So.3d 623, 627-28 (Ala.Civ.App.2009):
“We review a summary judgment de novo; we apply the same standard as was applied in the trial court. A motion for a summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. A party moving for a summary judgment must make a prima facie showing ‘that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law.’ Rule 56(c)(3); see Lee v. City of Gadsden, 592 So.2d 1036, 1038 (Ala.1992). If the movant meets this burden, ‘the burden then shifts to the nonmovant to rebut the movant’s prima facie showing by “substantial evidence.” ’ Lee, 592 So.2d at 1038 (footnote omitted). ‘[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989); see Ala.Code 1975, § 12-21-12(d). Furthermore, when reviewing a summary judgment, the appellate court must view all the evidence in a light most favorable to the nonmovant and must entertain all reasonable inferences from the evidence that a jury would be entitled to draw. See Nationwide Prop. & Cas. Ins. Co. v. DPF Architects, P.C., 792 So.2d 369, 372 (Ala.2000); and Fuqua v. Ingersoll-Rand Co., 591 So.2d 486, 487 (Ala.1991).
“To establish a prima facie case of retaliatory discharge, a discharged employee must establish that the employee and the employer had an employment relationship, that the employee suffered a work-related injury, that the employer knew that the employee had suffered a work-related injury, and that the employee was subsequently discharged based solely on the employee’s having filed a workers’ compensation claim arising from the work-related injury. See Massey v. Krispy Kreme Doughnut Corp., 917 So.2d 833, 836-37 (Ala.Civ.App.2005) (quoting Alabama Power Co. v. Aldridge, 854 So.2d 554, 563 (Ala.2002)). Because direct evidence demonstrating that an employer has discharged an employee solely because the employee has filed a workers’ compensation claim is not often easily obtained, an employee ... may establish by circumstantial evidence that the actual reason for the discharge was the employee’s filing of a workers’ compensation claim. Alabama Power Co. v. Aldridge, 854 So.2d 554, 564-65 (Ala.2002). In Al-dridge, our supreme court discussed sev *1021 en factors that a court may consider in determining whether the necessary causal relationship between the employee’s workers’ compensation claim and that employee’s discharge exists; evidence indicating the existence of those factors is circumstantial evidence indicating that the discharge was in retaliation for filing a worker’s compensation claim. Aldridge, 854 So.2d at 564-65. In addition to proximity of time between the filing of a claim and the discharge, id. at 566, the Aldridge court identified the following six factors:
“ ‘ “1) knowledge of the compensation claim by those making the decision on [discharge], 2) expression of a negative attitude toward the employee’s injured condition, 3) failure to adhere to established company policy, 4) discriminatory treatment in comparison to similarly situated employees, 5) sudden changes in an employee’s work performance evaluations following a workers’ compensation claim, and 6) evidence that the stated reason for the discharge was false.” ’
“Id. at 564-65 (quoting Chhim v. University of Houston, 76 S.W.3d 210, 218 (Tex.Ct.App.2002)).
“Once a discharged employee has demonstrated a prima facie case of retaliatory discharge, the burden shifts to the employer to establish a legitimate reason for the employee’s discharge. Ford v. Carylon Corp., 937 So.2d 491, 501 (Ala.2006). Once the employer has advanced a legitimate reason for the discharge, the burden again shifts to the discharged employee, who must present evidence demonstrating that the legitimate reason advanced by the employer is a mere pretext. Flint Constr. Co. v. Hall, 904 So.2d 236, 250 (Ala.2004). If the employer is able to establish a legitimate reason for the discharge and that reason is uncontradicted, the employer is entitled to a judgment as a matter of law in its favor. Aldridge, 854 So.2d at 568.
‘“An employer’s stated basis for a discharge is sufficient as a matter of law when the underlying facts surrounding the stated basis for the discharge are undisputed and there is no substantial evidence indicating (a) that the stated basis has been applied in a discriminatory manner to employees who have filed workers’ compensation claims, (b) that the stated basis conflicts with express company policy on grounds for discharge, or (c) that the employer has disavowed the stated reason or has otherwise acknowledged its pretextual status.’

“Id.”

Hale testified by deposition regarding the events of October 2008 and February and March 2009. He said that when he returned to work on October 5, 2008, after his surgery, he had continued to experience pain and swelling in his hands. He explained that the pain and swelling would increase through the day and that he could not work with the pain. Hale also noted that he had been restricted to using only his left hand and arm, which, he said, caused him difficulty while driving his automobile. According to Hale, he was also taking a prescribed narcotic pain reliever, which, he said, raised concerns in his mind about driving from his home in Sylacauga to HMMA, which is located south of Montgomery. Hale testified that he was also suffering from depression during this time. He said that he had called in each day that he had missed work.
According to Hale, his depression worsened and he became suicidal in early March 2009, after the February 24, 2009, meeting at which he was threatened with *1022 termination from his employment and the March 5, 2009, letter demanding documentation for his October 2008 and March 2009 absences and his October 2008 bereavement leave. In fact, Hale was hospitalized by his psychiatrist on March 8, 2009. He remained in the hospital until March 15, 2009. His depression, Hale said, was the result of the stress of his injury coupled with work-related stress caused by being treated differently by coworkers because of his injuries and resulting absences and by being under the threat of being discharged from his employment.
Hale admitted that he had received and had read the employee handbook. According to Hale, he had been subjected to an informal discussion regarding his attendance rate in March 2006; at that time, he said, the attendance policy was fully explained to him. Hale admitted that he understood the attendance policy and explained that he understood that even if he called in to work because of illness, his absence could be considered “unexcused” and could count against his attendance percentage. Hale said that he understood that any absence counted against him if no approved leave covered the absence. Hale also admitted having had another informal discussion regarding his attendance issues in May 2008.
Hale admitted in his deposition that he had not provided any “support” for his absences in October. In fact, he admitted that he had no documentation to prove that the absences were covered by any approved form of leave. In his affidavit, Hale states that Dr. Samuelson had “told me that he could not change the return to work form he had sent to [HMMA] in early October 2008.” Because Dr. Samuelson refused to give Hale an excuse to cover the October 2008 absences, Hale states in his affidavit, “it was impossible for me to get any such documentation or form.” Hale testified in his deposition that he had completed the bereavement-leave form at the February 24, 2009, meeting, but he said that “I just didn’t turn the obituary in on time,” despite having had the obituary since October 23, 2008.
On appeal, Hale first argues that HMMA should be barred from arguing that it discharged him from his employment for violating the attendance, bereavement-leave, and serious-misconduct policies because that issue was decided adversely to HMMA by the administrative hearing officer in Hale’s unemployment-compensation appeal. Hale relies on Wal-Mart Stores, Inc. v. Hepp, 882 So.2d 329, 331 (Ala.2003), overruled on other grounds by Ex parte Rogers, 68 So.3d 773 (Ala.2010), and Wal-Mart Stores, Inc. v. Smitherman, 743 So.2d 442, 444-45 (Ala.1999), overruled on other grounds by Ex parte Rogers, 68 So.3d 773 (Ala.2010). In both Smitherman and Hepp, our supreme court determined that collateral estoppel could be used to bar a retaliatory-discharge plaintiff from arguing that he or she was discharged for a reason other than “misconduct connected with his [or her] work” when that plaintiff had been denied full unemployment-compensation benefits under Ala.Code 1975, § 25-4-78(3)c., because of “misconduct connected with his [or her] work.”[1]
*1023 The Smitherman court began its analysis of the issue whether an administrative decision could serve as a basis for the application of the doctrine of collateral es-toppel by discussing the elements necessary for the doctrine to apply:
“In order for the doctrine of collateral estoppel to apply to an issue raised in an administrative proceeding, the following elements must be present:
“ ‘ “ ‘(1) there is identity of the parties or their privies; (2) there is identity of issues; (3) the parties had an adequate opportunity to litigate the issues in the administrative proceeding; (4) the issues to be es-topped were actually litigated and determined in the administrative proceeding; and (5) the findings on the issues to be estopped were necessary to the administrative decision.’ ” ’
“Ex parte Smith, 683 So.2d 431, 433 (Ala.1996) (quoting Ex parte Shelby Med. Ctr., Inc., 564 So.2d 63, 68 (Ala.1990) (quoting Pantex Towing Corp. v. Glidewell, 763 F.2d 1241, 1245 (11th Cir.1985))).”
Smitherman, 743 So.2d at 445.
According to the Smitherman court, each of the elements required for the application of the doctrine was present. Id. at 445-47. The parties agreed that the identity-of-parties element was satisfied. Id. at 445. The identity-of-issues element was satisfied, the court determined, because in Smitherman the employer was proffering as its legitimate reason for discharging the employee that she had committed misconduct in connection with her work, specifically, that she had made a profane and derogatory remark about a superior. Id. In the unemployment-compensation proceeding, the same issue— whether the employee had committed misconduct by making that remark — was the basis for the determination as to whether the employee was disqualified from receiving full unemployment-compensation benefits under Ala.Code 1975, § 25-4-78(3)c. Id. The unemployment-compensation proceeding had resolved that issue adversely to the employee by finding that she had committed misconduct in connection with her employment by making the derogatory and profane remark. Id. at 447. Additionally, the Smitherman court concluded that the employee had had an adequate opportunity to argue the issue, that the issue was actually litigated and determined in the unemployment-compensation proceeding, and that the findings on the issue were necessary to the result of the administrative proceeding. Id. at 446-47.
The Hepp court applied the doctrine of collateral estoppel in a nearly identical situation to that presented in Smitherman. In Hepp, like in Smitherman, the employee had been discharged from his employment for performing work that was not permitted, specifically, dispensing freon into his personal vehicle and the vehicle of an acquaintance without preparing a service order for either vehicle. Hepp, 882 So.2d at 330. The employee sought unemployment-compensation benefits, which were denied; the employee appealed the original denial, and, after a hearing, the referee denied the employee full benefits, determining that he had been discharged from his employment for violating his employer’s policies and had therefore committed misconduct in connection with his work, which disqualified him from receiving full unemployment-compensation benefits under § 25-4-78(3)c. Id. at 330-31. Relying on Smitherman, the Hepp court concluded that all the elements of collateral estoppel were satisfied and that the employee was precluded from relitigating the reason for the discharge from his employment. Id. at 335.
*1024 Based on the holdings in both Smither-man and Hepp, Hale argues that “the reverse argument is also true” — that the doctrine of collateral estoppel operates as a bar to an employer’s argument that it discharged an employee for a legitimate reason if that reason has been determined not to be misconduct that would disqualify the employee from receiving unemployment-compensation benefits in an administrative proceeding. We disagree. The reverse argument is not also true because, we conclude, the issues are not identical as a result of the posture of the parties.
The issue presented in Hale’s unemployment-compensation proceeding was whether he had been discharged from his employment for “misconduct committed in connection with his work ... repeated after previous warning.” § 25-4-78(3)b. To that end, HMMA presented to the Department of Industrial Relations its position that Hale had violated HMMA’s attendance, bereavement-leave, and serious-misconduct policies after being warned about his attendance issues. Although Hale was originally denied unemployment-compensation benefits, he was awarded those benefits after a hearing before an administrative hearing officer, who determined that Hale had not committed “misconduct,” as defined for purposes of the unemployment-compensation statute, in connection with his work. Notably, the hearing officer defined “misconduct” for purposes of the unemployment-compensation statute as being “deliberate, willful, or wanton disregard of the employer’s interests or of the standards of behavior which the employer has a right to expect of his employee.” That definition was taken almost verbatim from the definition given to the term “misconduct” in § 25-4-78(3)b. by this court in Davis v. Department of Industrial Relations, 465 So.2d 1140, 1142 (Ala.Civ.App.1984). Thus, the hearing officer in Hale’s unemployment-compensation proceeding was tasked with determining— and, in fact, did determine — whether Hale’s failure to comply -with HMMA’s policies was a “deliberate, willful, or wanton disregard” of the employer’s policies or interests.
It is imperative that we understand what the unemployment-compensation determination in favor of Hale was not. That determination was not a determination that the reason for Hale’s discharge from employment was not valid under HMMA’s policies, that HMMA’s proffered reasons were not legitimate or were pre-textual, or that HMMA terminated Hale’s employment for the sole reason that he had filed a workers’ compensation claim. Instead, that determination was a determination that Hale had not deliberately, willfully, or wantonly disregarded HMMA’s policies or interests because of compelling reasons that prevented his compliance and that Hale was therefore not disqualified from receiving unemployment-compensation benefits.
Unlike the posture of the appeals in Smitherman and Hepp, in which the unemployment-compensation proceeding had resulted in a determination that the employee had engaged in misconduct connected with his work, thus necessarily compelling the conclusion that the employer had a legitimate reason to terminate the employee’s employment, Hale was found not to have committed misconduct of the degree that would disqualify him from unemployment-compensation benefits. Because Alabama is an employment-at-will state, an employer can terminate an employee’s employment for any number of reasons — “ ‘a good reason, a wrong reason, or no reason at all.’ ” Ex parte Usrey, 777 So.2d 66, 68 (Ala.2000) (quoting Culbreth v. Woodham Plumbing Co., 599 So.2d 1120, 1121 (Ala.1992)). Thus, an employer may *1025 discharge an employee for nearly any reason, even if the reason does not amount to misconduct as that term is defined in the unemployment-compensation context.
Although a conclusion that an employee committed misconduct necessarily compels the conclusion that a legitimate reason for discharge exists, the reverse is not also true. Because Alabama law does not require that an employer have a “good” reason for discharging an employee, the fact than an employee was not discharged for misconduct does not compel the conclusion that the employer had no valid reason to discharge him or her or that the employer wrongfully discharged the employee. Thus, the conclusion that Hale had not committed misconduct sufficient to disqualify him from receiving benefits under the unemployment-compensation statute cannot be used to compel the conclusion that HMMA is unable to proffer Hale’s violation of the attendance, bereavement-leave, and serious-misconduct policies as legitimate reasons for Hale’s discharge. That is, even if Hale’s violation of those policies does not rise to the level of misconduct under the unemployment-compensation statute, that fact does not compel the conclusion that HMMA’s reliance on Hale’s violation of those policies does not form a legitimate reason for the termination of Hale’s employment and most assuredly does not compel the conclusion that HMMA’s proffered reason is a pretext for an otherwise impermissible discharge of Hale from HMMA’s employment in retaliation for filing a workers’ compensation claim. We therefore reject Hale’s argument that HMMA is collaterally estopped from proffering Hale’s violation of the attendance, bereavement-leave, and serious-misconduct policies as a legitimate reason for his discharge.
We now turn to an analysis of the summary judgment in favor of HMMA on its merits. As explained above, analysis of a summary judgment in a retaliatory-discharge case utilizes a burden-shifting analysis. Hale, as the plaintiff, was required to present evidence of a prima facie case of retaliatory discharge, after which HMMA assumed the burden of coming forward with a legitimate reason for Hale’s discharge; once HMMA presented evidence of a legitimate reason for Hale’s discharge, Hale was required to present substantial evidence indicating that the proffered reason for his discharge was mere pretext for HMMA’s decision to discharge him in retaliation for filing a workers’ compensation claim. Hatch, 35 So.3d at 628.
For purposes of our analysis of the summary judgment in favor of HMMA, we will assume, without deciding, that Hale presented substantial evidence of a prima facie case of retaliatory discharge. Thus, we will consider next whether HMMA proffered a legitimate reason for Hale’s discharge. If HMMA’s evidence of a legitimate reason for Hale’s discharge was un-contradicted, HMMA was entitled to the summary judgment the trial court entered in its favor. Our supreme court has explained that
“[a]n employer’s stated basis for a discharge is sufficient as a matter of law when the underlying facts surrounding the stated basis for the discharge are undisputed and there is no substantial evidence indicating (a) that the stated basis has been applied in a discriminatory manner to employees who have filed workers’ compensation claims, (b) that the stated basis conflicts with express company policy on grounds for discharge, or (c) that the employer has disavowed the stated reason or has otherwise acknowledged its pretextual status.”
Alabama Power Co. v. Aldridge, 854 So.2d 554, 568 (Ala.2002); see also Hatch, 35 *1026 So.3d at 628. We further note that “ ‘[a] company is not liable for retaliatory discharge when it [discharges] a worker based on the neutral application of an attendance policy.’ ” Walker v. DCH Reg’l Med. Ctr., 858 So.2d 221, 226 (Ala.Civ.App.2002) (quoting Syncro Corp. v. Suttles, 814 So.2d 873, 876 (Ala.Civ.App.2000)); see also Smith v. Dunlop Tire Corp., 663 So.2d 914 (Ala.1995); Hiatt v. Standard Furniture Mfg. Co., 741 So.2d 407 (Ala.Civ.App.1998).
The facts surrounding Hale’s discharge are largely undisputed.[2] Hale was released to return to work by his doctor on October 6, 2008. Hale missed nine days in the two-week period following his release to return to work. Hale also took a bereavement day during that two-week period. Hale was then out of work on short-term disability until February 16, 2009.
When Hale did not return to work at the end of his short-term-disability leave, Spaulding contacted him by letter to request that he contact Spaulding and immediately return to work or apply for further approved medical leave and to request that he provide documentation for his absences in October 2008 because, otherwise, those absences would be counted against, and negatively affect, his attendance percentage. As requested, Hale contacted Spaulding and returned to work on February 24, 2009; Hale did not, however, provide any documentation relating to his October 2008 absences to Spaulding or to HMMA. On the day he returned to work, Hale was called into a formal discussion with Waites, Brown, and Smith about his absences. At that meeting, Hale was informed that HMMA required documentation regarding his October 2008 absences, a bereavement-leave form, and proof of a familial relationship between him and his “aunt” to verify that Hale qualified for bereavement leave. Hale completed, with Smith’s assistance, a bereavement-leave form at the meeting. Hale was informed that the remaining documentation was required to be provided by March 2, 2009.
Hale failed to provided any of the requested documentation by March 2, 2009. Spaulding sent a second letter on March 5, 2009, demanding the documentation by March 12, 2009. In that letter, Spaulding warned Hale that Hale would be subject to discharge if he failed to provide the requested documentation by March 12, 2009. When Hale failed to present any of the requested documentation by March 12, Rose sent Hale a final letter, in which she discharged him from his employment.
Hale admits that he never provided any documentation that his October 2008 absences were covered by any form of approved leave and that he never provided an obituary or other proof that he had a familial relationship with his “aunt” that would entitle him to bereavement leave. He argues that he could not have provided documentation that he was approved for leave in October 2008 because Dr. Samuelson had refused to change the date on his return-to-work authorization. He also argues that he testified that he did not violate the bereavement-leave policy because he attended the funeral of his aunt, who was a relative for whom such leave is permitted, and that such testimony is sufficient to at least create a question of fact *1027 regarding whether he violated the bereavement-leave policy.
Hale’s “impossibility” defense regarding his October 2008 absences misses the mark. Hale had been cleared to return to light-duty work at HMMA on October 6, 2008. At that point, he was no longer on an approved form of leave for a work-related injury. The fact that he continued to suffer pain and swelling as a result of his work-related injury, while unfortunate, is not sufficient to establish that his absences should not be counted against him under the attendance policy. In fact, Hale admits that his October 2008 absences were not covered by any approved form of leave and that they could be counted against him under the attendance policy.
Although Hale testified that he used bereavement leave for an approved relative — his “aunt” — he misunderstands the consequences of his failure to provide supporting documentation of the relationship when such was requested by HMMA. The bereavement-leave policy addendum states that HMMA may request documentation to verify a familial relationship in order to determine whether an employee qualifies for bereavement leave under the policy. Despite HMMA’s request for such documentation, Hale failed to provide it although he admitted that he had had access to the obituary since October 2008. The only excuse for failing to provide the requested documentation Hale offered in his testimony was that he had not had time to provide the obituary. However, Hale was first informed of the need to provide documentation to verify a familial relationship, at the latest, on February 24, 2009, more than two weeks before HMMA discharged him from his employment. Although Hale testified that he was, in fact, related to his “aunt,” HMMA had the right to insist on proof of a familial relationship to prevent abuse of its bereavement-leave policy. Hale admittedly failed to provide the documentation at any time before he was discharged.
Hale further argues that HMMA’s proffered reason for his discharge should be rejected as pretextual because HMMA failed to comply with its attendance policy, which mandates progressive discipline for attendance issues. The attendance policy does state that four steps must be followed when corrective action must be taken because of an employee’s attendance problems. However, although it is apparent that, at best, HMMA complied with only the first two steps — informal discussion and formal discussion — HMMA points out that its serious-misconduct policy permits HMMA to forgo the corrective-action steps in situations that are considered serious enough to require the immediate discharge of an employee. The serious-misconduct policy covers, among other things, “serious and/or excessive violations of HMMA’s attendance [policy]” and “intentionally misrepresenting or falsifying any information concerning employment....” HMMA argues that Rose’s letter stated clearly that Hale was discharged based on his attendance percentage both for violating the attendance policy and for violating the serious-misconduct policy. In addition, Rose relied on the serious-misconduct policy as a basis for discharging Hale for violating the bereavement-leave policy because he failed to provide documentation of his familial relationship with his “aunt”; as the bereavement-leave policy addendum stated, HMMA considered use of bereavement leave for a noneligible relative to be an act of falsification and, therefore, a violation of the serious-misconduct policy.
The facts surrounding Hale’s discharge support the conclusion that HMMA discharged him for the proffered reason— violations of HMMA’s attendance, bereavement-leave, and serious-misconduct *1028 policies. Hale admitted that he had never provided the requested • documentation regarding either his October 2008 absences or his bereavement leave to HMMA, despite repeated requests. Hale provided no evidence indicating that the proffered reason was “applied in a discriminatory manner to employees who ha[d] filed workers’ compensation claims.” Hatch, 35 So.3d at 628. Furthermore, Hale provided no evidence indicating that HMMA either “disavowed the [proffered] reason or otherwise acknowledged its pre-textual status.” Id. The evidence Hale presented regarding whether the proffered reason “conflicts with expressed company policy on grounds for discharge,” id. — that HMMA did not follow the four-step corrective-action policy set out in its attendance policy — is not substantial evidence indicating that HMMA violated its own policies because HMMA discharged Hale under its serious-misconduct policy, which permits HMMA to forgo the corrective-action policy in certain circumstances, including serious violations of the attendance policy and situations involving the falsification of employment records like bereavement-leave requests. The evidence supporting HMMA’s proffered reason for discharging Hale was “uncontradicted evidence of an independently sufficient basis for the discharge,” and HMMA was entitled to a summary judgment in its favor. Aldridge, 854 So.2d at 568; see also Hatch, 35 So.3d at 628.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, BRYAN, and MOORE, JJ., concur.

. Section 25-4-78(3)c. disqualifies an employee from receiving full unemployment-compensation benefits when an employee is discharged for misconduct connected with his or her work but permits an award of partial benefits. Section 25-4-78(3)b., however, disqualifies an employee from receiving any unemployment-compensation benefits because of misconduct connected with his or her work repeated after previous warning regarding that misconduct.

. That is not to say that some immaterial facts are not disputed. However, although there are some discrepancies in the testimony regarding, for example, whether Spaulding informed Hale of the need for documentation some time before February 2009, we have viewed the facts in the light most favorable to Hale, as required by the standard of review, and the material facts relating to Hale’s absences and the process by which Hale was discharged are not a matter of dispute.